Stephen **BROWN, Douglas Shepard, Edward Schweikert, Thomas McCoy and Charles Tomasello, Plaintiffs–Appellants,**

v.

**AMPCO–PITTSBURGH CORP., Defendant–Appellee.**

No. 88–1387.

United States Court of Appeals, Sixth Circuit.

Submitted March 30, 1989.

Decided June 7, 1989.

---

Phillip I. Frame, Jackson, Mich., for Stephen Brown, Douglas Shepard, Edward Schweikert, Thomas McCoy, and Charles Tomasello, plaintiffs-appellants.

Robert F. Best, Jackson, Mich., for Ampco–Pittsburgh Corp., defendant-appellee.

Before MERRITT and NELSON, Circuit Judges, and LIVELY, Senior Circuit Judge.

LIVELY, Senior Circuit Judge.

This case arises under ERISA, the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001 et seq. (1982). It concerns the right to severance pay benefits. The district court upheld the defendant employer's computation and payment of termination allowances under a plan promulgated in December 1985, effective January 1, 1986. The plaintiffs claimed they were entitled to larger allowances under "guidelines" circulated internally to management personnel in 1984. A remand is necessary because the district court reviewed the defendant's decision under a standard previously adopted by this court, but subsequently rejected by the Supreme Court.

## I.

### A.

The plaintiffs were salaried non-union employees at the Jackson, Michigan plant of Pittsburgh Forging Company, a subsidiary of the defendant, Ampco–Pittsburgh Corporation (Ampco). On May 1, 1985, the union employees at the Jackson plant went on strike. Shortly thereafter Ampco laid off non-union employees at Jackson, including the plaintiffs. The strike continued until May 30, 1986. The Jackson plant then resumed production with about one-half the hourly workforce it had employed at the beginning of the strike. On July 11, 1986, Ampco notified the plaintiffs in writing that they would not be recalled and advised them of the termination pay they would receive.

Believing they were entitled to a larger amount of termination pay, the plaintiffs filed this action in the district court. The complaint alleged that in May 1985 Ampco maintained a severance pay policy under which each salaried employee upon termination would receive one week's salary for each year of service to the company. The plaintiffs alleged that prior to being laid off they were assured that each would be paid according to the policy in effect in May 1985. During the plaintiffs' layoff, the complaint charged, Ampco unilaterally made changes in the severance pay policy that reduced by one-half the number of weeks' salary for each year of service. Ampco computed their benefits under the "new policy" when it terminated them in July 1986. The plaintiffs claimed breach of contract and sought $21,343 as damages, the total difference between the benefits to which they would be entitled under the

1984 plan and the amount they received under the 1986 plan.

In its answer Ampco admitted that the plaintiffs were "temporarily" laid off in May 1985 shortly after the strike began and were finally terminated on July 11, 1986. Ampco denied that it ever had a "policy" that provided one week of termination pay for each year of service. It claimed it had no termination allowance policy prior to institution of the 1986 plan. Between July 1984 and December 1985, according to Ampco, it had only "some nonmandatory guidelines." Since there was no policy in May 1985, no breach of contract occurred. Any oral assurances to the plaintiffs concerning termination allowances were made without authority from the company.

### B.

The record reveals that Ampco circulated an internal memorandum to various management personnel on June 20, 1984. The memorandum, marked "confidential," announced "termination allowance guidelines" for non-union salaried employees effective July 1, 1984. An attachment to the memo set forth terms and conditions for paying such allowances. The following provisions are pertinent to our inquiry:

1.0 *Purpose*

1.1 A salary termination allowance will be paid to only those employees whose services are terminated by the Company pursuant to a reduction in force.

2.0 *General*

2.1 A termination allowance will not be paid when the work force reduction is considered temporary, and the Company intends to recall the employee or employees who are laid off. However, if layoff continues for twelve (12) consecutive months, the reduction in force will be deemed permanent and the termination allowance will be paid.

2.2 Employees who at the time of termination are eligible for an immediate unreduced pension under any pension plan to which the Company contributes, or who have reached age 70 shall not be eligible for a termination allowance.

2.3 The amount of termination allowance shall be one week for each full year of service with a minimum of two weeks for less than three full years of service and a maximum of 26 weeks for 26 full years of service or more. The allowance is to be paid on regular paydays following the termination.

The guidelines were not distributed to any salaried non-union employees except the addressees of the memorandum. Nor did Ampco include the guidelines in a personnel policy manual or similar publication.

On December 30, 1985, Ampco announced a "termination allowance policy" for non-union salaried employees effective January 1, 1986. The policy was set forth in an attachment, and the addressees were instructed that "[t]his policy should be inserted into the Corporate Personnel Policy Manual." As pertinent here, the policy stated:

1.0 *Purpose*

1.1 A salary termination allowance will be paid to only those employees whose services are terminated by the Company due to a reduction in force.

2.0 *Policy*

2.1 A termination allowance will not be paid when the workforce reduction is considered temporary, and the Company intends to recall the employees who are laid off.

2.2 The amount of the termination allowance will depend on the number of full years of service and will be computed and paid at the individual's base weekly salary rate at the time of termination. The allowance is to be paid on regular paydays following the termination.

| Length of Service | Number of Weeks of Termination Allowance |
|---|---|
| Up to 5 years | 2 Weeks |
| 5 Years to 10 Years | 4 Weeks |
| 10 Years to 15 Years | 6 Weeks |
| 15 Years to 20 Years | 8 Weeks |
| 20 Years and Over | 10 Weeks |

Both the guidelines and the policy provided benefits only for terminations pursuant to a reduction in force. Neither provided

payments during temporary layoffs. Both the 1984 guidelines and the 1986 policy treated all workforce reductions as temporary so long as "the Company intends to recall the employees who are laid off." The 1984 guidelines, however, "deemed" a reduction in force permanent if a layoff continued for twelve consecutive months. The 1986 policy had no similar provision for automatic qualification.

## II.

### A.

Ampco moved for summary judgment, asserting that there were no genuine issues of material fact and that it was entitled to judgment as a matter of law. It argued that both the guidelines and the policy provided for an allowance only in the event of termination; a layoff did not trigger entitlement. The plaintiffs were laid off, not terminated, during the period that the guidelines were effective. Ampco adopted the policy more than six months before it terminated the plaintiffs. Therefore, the plaintiffs' rights were governed by the 1986 policy. For these reasons, Ampco argued, it did not act arbitrarily and capriciously when it paid the plaintiffs termination allowances as provided by the 1986 policy.

Resisting the motion, the plaintiffs contended that Ampco acted arbitrarily and capriciously when it amended its severance pay policy to reduce benefits while the plaintiffs were laid off. The plaintiffs argued that both plans were "silent," in violation of ERISA's disclosure and reporting requirements. 29 U.S.C. §§ 1021–31. The 1984 guidelines were silent because they were contained in a confidential internal memo that was not communicated to the affected employees. The 1986 policy was silent, the plaintiffs maintained, because it was not disclosed to them until they were terminated six months after its effective date.

The plaintiffs admitted that the 1986 policy was not directed at them—that it applied to over 1900 salaried non-union employees at more than 30 Ampco plants. Neverthe-

less, they argued that Ampco's failure to comply with procedural requirements of ERISA invalidated Ampco's attempt to substitute the 1986 policy for the 1984 guidelines. Although arguing that neither the guidelines nor the policy was properly disclosed to them, they contended that the alleged promise of benefits made at the time they were laid off entitled them to severance pay under the 1984 guidelines.

Ampco responded that the 1986 policy was not "silent" because it had been published in the personnel manual. Moreover, it made no difference that the plaintiffs had no knowledge of the policy's provisions. Even if Ampco had not disclosed the 1986 policy, this omission would not have harmed the plaintiffs. They were paid benefits as prescribed by the only plan in effect when they were terminated.

### B.

The district court granted Ampco's motion for summary judgment on March 16, 1988. It found that the plaintiffs had produced no evidence that the 1986 policy was silent. It had been adopted in December 1985 and published in the company's personnel manual. The court found that the plaintiffs' lack of knowledge of the 1986 policy was not controlling. That policy was in effect when Ampco terminated the plaintiffs, and it "modified, replaced or supplemented the provisions of [the] 1984 [guidelines]." Since Ampco did not single out the plaintiffs and direct the policy's reduced benefits at the plaintiffs specifically, Ampco did not act arbitrarily or capriciously in awarding termination allowances on the basis of the 1986 plan.

## III.

The district court followed this court's rulings in reviewing Ampco's decision to award benefits pursuant to the 1986 plan under the arbitrary and capricious standard. See *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 76, 102 L.Ed.2d 52 (1988) ("A plan administrator has broad discretion in deciding questions of coverage and eligibility for benefits. This court has held

repeatedly that the appropriate determination in reviewing the decision of a plan administrator with respect to a claim for benefits is whether the decision was arbitrary, capricious, made in bad faith or otherwise contrary to law."), citing *Adcock v. Firestone Tire and Rubber Co.*, 822 F.2d 623, 626 (6th Cir.1987) ("In reviewing the decisions of plan administrators under ERISA, the appropriate standard of review is whether the decision was arbitrary, capricious, or in bad faith."). Although most other circuits have applied the arbitrary and capricious standard, its rigid application has been criticized. See, *e.g.*, *Van Boxel v. Journal Co. Employees' Pension Trust*, 836 F.2d 1048, 1049–53 (7th Cir. 1987).

■ In *Firestone Tire and Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court rejected application of the arbitrary and capricious standard when an administrator's decision to deny benefits is challenged under 29 U.S.C. § 1132(a)(1)(B). Instead, applying principles of trust law, the Court declared that a de novo standard of review is appropriate. "[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." 109 S.Ct. at 956. As the Court pointed out in *Bruch*, ERISA abounds with trust language and terminology. The purposes of ERISA are to promote and protect the rights of employees and their beneficiaries in employee benefit plans. *Id.* at 955. Absent a clear grant of discretion to the administrator, application of the highly deferential arbitrary and capricious standard of review does not promote these goals. In conducting a de novo review, the court is bound by the provisions of the documents establishing an employee benefit plan "without deferring to either party's interpretation." *Id.* As the court noted in *Bruch*, "the validity of a claim to benefits under an ERISA plan is likely to

turn on the interpretation of terms in the plan at issue." *Id.* at 956. This interpretation must be based on a de novo review applying trust principles.

■ Although the 1986 plan[1] provides that termination occurs when Ampco no longer intends to recall employees who are laid off, this is not a grant of discretion to determine eligibility for benefits. It merely states the basis for distinguishing between temporary layoffs and permanent employment terminations. Once the decision not to recall is made, eligibility for benefits is automatic. Thus, on remand the district court will conduct a de novo review of Ampco's decision to award benefits under the 1986 rather than the 1984 plan.

### IV.

Although we are remanding the case, it is appropriate to decide several of the issues raised by the parties on appeal.

### A.

At oral argument on the motion for summary judgment, counsel for the plaintiffs agreed that the 1984 plan was "silent." Ampco argues on appeal that this constituted a concession that the 1984 plan could provide no basis for the plaintiffs' claim to larger benefits. Ampco reasons that a silent plan communicates no offer and that without an offer there can be no acceptance, and thus no contract. In effect, Ampco argues that the plan's silence rendered it a nullity. The plaintiffs respond that the significance of the plan's silence is that it was maintained in violation of ERISA's reporting and disclosure requirements. Their concession concerning "silence" did not mean that the plan was non-existent. The failure to comply with ERISA's procedural requirements is not ordinarily a basis for substantive relief. See *Wolfe v. J.C. Penney Co., Inc.*, 710 F.2d 388, 393 (7th Cir.1983). However, the plaintiffs do not seek damages based on Ampco's failure to comply with ERISA's

---

**1.** We refer to both the 1984 "guidelines" and the 1986 "policy" as "plans." Since Ampco did not name an independent administrator or fiduciary, it was administrator of both plans.

procedural requirements. Their position is that Ampco established an employee welfare benefit plan in 1984, concealed it from participants and beneficiaries, and then sought to evade its requirements by paying benefits under a plan adopted unilaterally and published later.

We agree with the Eleventh Circuit's approach to determining whether an employer has established an employee benefit plan. In *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982), then Chief Judge Godbold wrote for the en banc court:

> In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits.

*Id.* at 1373. Applying these criteria, Ampco's promulgation of the 1984 guidelines did create a plan for payment of termination benefits.

The plaintiffs' concession that the 1984 plan was silent did not preclude their reliance upon the terms of that plan as a basis for their claims. As the court stated in *Blau v. Del Monte Corp.*, 748 F.2d 1348, 1352 (9th Cir.1984), *cert. denied*, 474 U.S. 865, 106 S.Ct. 183, 88 L.Ed.2d 152 (1985), "Once established, ERISA operates to protect an employee's interest in the welfare benefit program regardless of whether the employer complies with the administrative and reporting requirements detailed under ERISA." It would be unreasonable and antithetical to ERISA's purposes to hold that an employer can create an employee benefit plan and then deny benefits on the ground that it never communicated the plan to affected employees.

### B.

We conclude that both the 1984 and 1986 plans are valid. The question is when did the plaintiffs' right to termination allowances vest. ERISA does not subject welfare benefit plans to the elaborate vesting requirements applicable to pension plans. See 29 U.S.C. § 1053. An examination of the 1984 and 1986 plans reveals that both based eligibility for benefits on Ampco's intention not to recall employees laid off during a reduction in force. The 1984 plan "deemed" this decision to have been made if a layoff continued for twelve consecutive months, whereas the 1986 plan had no such automatic triggering mechanism.

Upon remand the district court must determine when the plaintiffs' rights vested. This will require further inquiry to determine when Ampco no longer intended to recall the plaintiffs. Ampco asserts that because this decision was not made until the time of the plaintiffs' formal termination in July 1986, the 1986 plan controls. However, the plaintiffs were laid off while the 1984 plan was in effect. They had no knowledge of the changes made by the 1986 plan and claim they were informed at about the time they were laid off that they would be paid under the then-existing plan. These are factual questions for the district court. The plaintiffs also appear to argue that the very fact of Ampco's adoption of the 1986 plan, with its lower severance allowances, while they were laid off, is evidence that Ampco determined in December 1985 not to recall them.

The judgment of the district court is reversed and the case is remanded for further proceedings.

DAVID A. NELSON, Circuit Judge, concurring.

I concur, but write separately to emphasize the narrow scope of the question to be determined on remand.

Although the plaintiffs contended, in their answer to the motion for summary judgment, that the defendant's decision to amend its severance pay policy was "arbitrary and capricious," the contention is bootless. "The case law," as we pointed out in *Musto v. American General Corp.*, 861 F.2d 897, 912 (6th Cir.1988), *cert. denied*, —— U.S. ——, 109 S.Ct. 1745, 104 L.Ed.2d 182 (1989), "makes it clear that when an employer decides to establish, amend, or terminate a benefits plan, as opposed to ... administering the plan in

accordance with its terms, its actions are not to be judged by fiduciary standards." Nothing in *Firestone Tire & Rubber Co. v. Bruch*, —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), casts the slightest doubt on the validity of this well established principle. In conducting its *de novo* review of defendant Ampco's decision to award benefits under the 1986 plan rather than under the 1984 plan, therefore, the district court's sole concern will be to determine—in summary judgment proceedings if appropriate, and otherwise at trial—whether the plaintiffs' services were "terminated by the Company pursuant to a reduction in force," within the meaning of those words as used in the 1984 plan, before the 1984 plan was amended or replaced on January 1, 1986.

A straightforward reading of the plaintiffs' complaint would seem to suggest that the 1986 plan became effective "during the pendancy of the Plaintiffs' lay-offs," as the complaint alleges, and before the plaintiffs' services were "terminated." In consonance with the complaint, the defendant asserted in its summary judgment papers that the plaintiffs "were laid off [in 1985] and then terminated 13 months later...." The plaintiffs seemed initially to agree; their brief opposing summary judgment said that "Plaintiffs were on lay-off until July 11, 1986, when they received identical form letters advising them of termination...." Later in the same brief, however, the plaintiffs argued that "if the company intended the lay-offs to be permanent at the time of the lay-off, then the severance pay would be payable presumably upon permanent lay-off." That proposition is arguably correct, it seems to me, and if the district court concludes that it is correct, the defendant would have the burden, in summary judgment proceedings, of showing that it did not intend to effect a permanent lay-off of the plaintiffs prior to 1986. If the case goes to trial, of course, the plaintiffs will have the burden of showing that the defendant intended, prior to 1986, that the lay-offs be permanent. That is the only open issue, as I understand it, assuming that the district court agrees that an intent that the lay-offs be permanent, if such an intent was formed before the effective date of the 1986 plan, would be sufficient to trigger the severance pay provision of the 1984 plan.